IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

COUNTY OF WASHINGTON,           )
PENNSYLVANIA, on behalf of itself and )
all similarly situated Pennsylvania    )        Civil Action No. 11-1405
Counties,                       )        District Judge
     Plaintiff,              )        Magistrate Judge Cynthia Reed Eddy
                                )
       v.                   )
                                )
U.S. BANK NATIONAL              )
ASSOCIATION,                    )
     Defendant.              )

## REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

Defendant U.S. Bank Association ("U.S. Bank") is the designated trustee for residential

mortgage backed security ("RMBS") trusts which include mortgage loans on real estate situated

in Washington County and other counties in Pennsylvania. The County of Washington, on

behalf of itself and all other Pennsylvania counties, initiated this action in the Court of Common

Pleas of Washington County alleging that U.S. Bank violated Pennsylvania law by failing to

record with the Recorders of Deeds assignments of certain beneficial interests in said mortgage

loans.

These assignments were made in a complicated series of transfers of beneficial interests

in mortgage notes held by such RMBS trusts that are secured by mortgages naming Mortgage

Electronic Registration Systems, Inc. ("MERS") as the mortgagee, but only in a "nominee"

capacity. This complex mechanism was designed and implemented in order to be able to

"securitize" mortgage loans and package them as RMBS trusts for investment. According to the

Complaint, this securitization also had the effect, and the intent, to deprive County of

1

Washington and other Pennsylvania counties of the statutory recording fees that are required for every transfer of a beneficial interest in a mortgage.

U.S. Bank filed a Notice of Removal pursuant to 28 U.S.C. § 1441(a) on November 3, 2011, claiming original jurisdiction exists in federal court on the basis of diverse citizenship of the parties and an amount in controversy in excess of $75,000. 28 U.S.C. §1332(a)(1) ("district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States . . . ."). After careful consideration of the Complaint and Defendant's Notice of Removal, Plaintiff's Motion to Remand (ECF No. 9) to state court for lack of jurisdiction, extensive briefing in support of and in opposition to the Motion to Remand, months of U.S. Bank's internal investigation and "information gathering" from various sources within and outside the bank, oral argument, testimony and documents submitted at an evidentiary hearing on July 2, 2012, and post-hearing submissions, this Court finds that U.S. Bank has failed to meet its burden of proving, by a preponderance of competent, admissible evidence, that the amount in controversy exceeds $75,000, the threshold for diversity of citizenship jurisdiction.

Accordingly, this Court recommends that Plaintiff's Motion to Remand be granted and that this case be remanded to the Court of Common Pleas of Washington County for further proceedings.

## II.    REPORT

### A.    Procedural Background

#### 1.    County of Washington's State Court Action

U.S. Bank, a national bank with its principal place of business in Ohio, serves as trustee for RMBS trusts containing mortgage loans on properties located in Washington County and

other counties in Pennsylvania, including a trust known as the Mortgage Asset-Backed Pass

Through Certificates Series 2005-EFC3, also known as "RAMP Series 2005-EFC3." The County

of Washington, a political subdivision, one of 67 Pennsylvania counties, initiated the state court

action on September 28, 2011, when it filed a three count Complaint in the Court of Common

Pleas of Washington County. County of Washington summarizes the "Nature of the Action" as

follows:

> This is an action brought by the County of Washington,
> Pennsylvania, on its own behalf and on behalf of . . . all other similarly
> situated Pennsylvania Counties . . . against [U.S. Bank]. The Counties
> seek to recover the benefit Defendant received by relying on the real
> property recording systems of the Counties without compensating the
> Counties for that benefit. In connection with the creation of various
> residential mortgage backed security ("RMBS") trusts that purportedly
> hold mortgage loans on properties located in the Counties, the Defendant
> represented at the time these trusts were created that they possessed all the
> rights to certain mortgage loans attached to these properties, free and clear
> of any encumbrance. On the basis of these representations, the Trustee
> claims priority on the mortgages, the right to foreclose on non-performing
> mortgages, favorable tax treatment, insulation from the bankruptcy of
> other entities in the mortgage loans' chain of title, and other benefits. The
> Defendant, however, did not record, or cause to be recorded, certain
> mortgage assignments at the time the trusts were created, nor did it pay the
> accompanying fees, which are preconditions for enjoying the enumerated
> benefits. Rather, Defendant participated in a scheme by which it had notes
> transferred to the trusts it administered and recorded the change in note
> ownership only in the records of Mortgage Electronic Registration
> Systems, Inc. ("MERS"), a private corporation created for the express
> purpose of circumventing the payment of mortgage assignment fees to
> county governments. Consequently, Defendant has unjustly received a
> benefit which it should not be allowed to retain.

Complaint, (ECF No. 1-2), at 6-7.

The Complaint specifically identifies only one RMBS trust to which U.S. Bank is trustee,

the RAMP Series 2005-EFC3 trust. The mechanism summarized above involving assignments of

beneficial interests in mortgage loans through a chain of title and through the MERS-as-nominee

system is known as "securitization." It is the mechanism by which, according to Plaintiff,

statutory recording fees are avoided.  Pennsylvania law requires that mortgage assignments must be in writing and filed with the counties' Recorders of Deeds within six months of origination, 21 Pa. Stat. Ann. § 621 (2001), and that for each recorded assignment, Washington County is entitled to a recording fee of $52.50. Complaint, (ECF No. 12), at ¶¶ 13, 31.

The Complaint describes the securitization process in some detail,[1] as follows:

B.    Securitization

15.    Filing mortgages and mortgage assignments with local recorders of deeds are critical preconditions to residential mortgage securitization. Securitization is a financing method in which securities are issued against a dedicated cash flow stream of mortgage payments. Two features of residential mortgage backed securities, in particular, boost their value relative to their investment options: bankruptcy-remoteness and favorable tax treatment as a real estate mortgage investment conduit ("REMIC") under the Internal Revenue Code.

16.    In order for trusts to enjoy the benefits of bankruptcy-remoteness and pass through tax status, they must have been formed in a particular way, and their assets must have been transferred to them in a particular manner. There are two documents in particular that need to be properly transferred to the trust - a promissory note and the mortgage. The promissory note is the loan contract -- it is the I.O.U. containing the borrower's promise to repay the money lent. The mortgage is the document conferring the right to enforce the promise to pay through foreclosure. Possession of a note without a mortgage amounts to possession of unsecured debt. The term "mortgage loan" generally refers to the mortgage and note together, although colloquially the term "mortgage" is also often used to refer to both the mortgage and the note.

17.    The residential mortgage securitization process is structured in a complex and detailed way to ensure that bankruptcy-remoteness and REMIC tax status are achieved. First, securitization of mortgage loans begins with origination of a loan by a lender such as a bank, finance company, or mortgage broker. Second, a financial institution (the "sponsor" or "seller") assembles a pool of mortgage loans that it originated and/or it that it purchased from unaffiliated third-party originating lenders.

---

[1]  In setting forth Plaintiff's allegations from its Complaint, the Court of course expresses no opinion on the merits of its claims or the accuracy of its descriptions. Nevertheless, the Court deems it necessary to supply some context and detailed description of the securitization process involved in order to properly frame and assess the sole jurisdictional issue raised – the amount in controversy.

Third, the pool of loans is sold by the sponsor to a special purpose subsidiary (the "depositor") that has no other assets or liabilities. This step is executed to segregate the mortgage loans from the sponsor's assets and liabilities. Fourth, the depositor sells the loans to the trust, a single-purpose vehicle, which issues pass-through securities

18.      The trusts are formed pursuant to, and are governed by, contracts called Pooling and Servicing Agreements ("PSAs"), which are crafted to ensure that the benefits of mortgage securitization flow to the trusts.

\*     \*     \*

21.      For example, the PSA for MORTGAGE ASSET-BACKED PASS THROUGH CERTIFICATES SERIES 2005-EFC3 contains the standard definition of "mortgage loan" . . . .

22.      The PSA for MORTGAGE ASSET-BACKED PASS THROUGH CERTIFICATES SERIES 2005-EFC3 also contains boilerplate warranties made by the Depositor . . . [including that] (a) . . . (ii) immediately prior to the conveyance of the Mortgage Loans to the Trustee, the Depositor had good title to, and was the sole owner of, each Mortgage Loan free and clear of any pledge, lien, encumbrance or security interest (other than rights to servicing and related compensation) and such conveyance validly transfers ownership of the Mortgage Loans to the Trustee free and clear of any pledge, lien, encumbrance or security interest . . . .

\*     \*     \*

24.      In spite of the clear language in the PSAs stating that all rights to the mortgage loans have been transferred to the trusts free and clear of any encumbrance, the mortgages remain listed in county recorders of deeds offices in the name of the originating lenders of the mortgage loans and have not been assigned to the trusts. In order to satisfy the language in the PSA transferring all rights to the mortgage free and clear of any encumbrance and to have priority and lawfully enjoy the benefits of proper securitization, Defendant would have needed to record, or cause to be recorded, all mortgage assignments from originating lenders to the depositors to the trusts, and to pay the accompanying recording fees.

25.      In the absence of a valid assignment, legal title to the mortgage, priority and the right to foreclose remain with the originating lender.

26.      Thus, although Defendant crafted the PSA's language for it, and the trust, to reap the benefits of true sales, bankruptcy-remoteness, REMIC status, and other elements of properly formed RMBS trusts, Defendant did not record all mortgage assignments from originating lenders to depositors to trustees, which are preconditions for enjoying these benefits.

Complaint, (ECF No. 1-2), at ¶¶ 15-18, 21-26.

Plaintiff alleges that Mortgage Electronic Registration Systems, Inc. was created so that it could be designated as the recorded mortgagee, in a nominee capacity only, but not record mortgage assignments when the accompanying notes became securitized, and in this way continue to receive all of the benefits of the counties' mortgage recording systems. Plaintiff claims, however, that MERS and the securitization mechanism are "defective and incapable of transferring all rights to the mortgage loans free and clear of any encumbrance to the trust, as required by the PSA . . ." Complaint, (ECF No. 1-2), at ¶ 28. County of Washington further alleges that the "express purpose [of MERS] was to circumvent recording assignments and paying fees to country recorders of deeds . . ." and to "eliminate the need for frequent, recorded assignments of subsequent transfers." Complaint, (ECF No. 1-2), at ¶¶ 30. The "avoidance" of recording fees for assignments of beneficial interests in mortgages, according to Plaintiff, "has resulted in the loss of millions of dollars to county governments and taxpayers from the collection of recording fees. . . ." and is estimated to have resulted in the loss of over $100 million throughout the Commonwealth of Pennsylvania, which fees are "allocated to maintain the county recorders' records as well as fund other county services such as children and youth services, veterans affairs, health centers, and housing assistance." Complaint, (ECF No. 1-2), at ¶ 31.

County of Washington gives two examples of mortgages recorded with the County's Recorder of Deeds and held in trust by U.S. Bank, and some of the consequences of failure to record and pay fees on the various assignments, as follows:

> 44. Consider a typical mortgage filed in the County Record[er] of Deeds for Washington County, PA that is attached to a note purportedly deposited in an RMBS trust administered by Defendant U.S. National Bank, as Trustee, and that lacks recorded mortgage assignments from the originating lender to the depositor to the trust. See Exhibit B, at p. 2;

Exhibit A, at p. 266 of 1830 (listing a mortgaged property in Washington, PA with a Note date of June 8, 2005 and an original balance of $114,000.00 . . . . The mortgage states that MERS is "acting solely as a nominee for Lender and Lender's successors and assigns." Exhibit B, at p. 1. The mortgage lists the "lender" as "EquiFirst Corporation." Yet, the mortgage also proclaims that "MERS is the mortgagee under this Security Instrument." *Id*.

45. In order for MERS to have authority to assign mortgages according to the note-holder's instructions, the original lenders must grant MERS the authority to assign since MERS is the limited agent of the originating lenders. Because the transactions are assignments of real estate interests, this agency relationship must be committed to writing to satisfy Pennsylvania's Statute of Frauds. No such writings exist.

46. The recording of MERS as "mortgagee" in mortgages is a false and misleading statement that confers no power on MERS to assign mortgages pursuant to the note-holder's instructions and that cannot be reconciled with MERS' status as mere "nominee" in the same document.

47. Without the mortgages in its name, or even the power to direct the use of the mortgages, Defendant U.S. National Bank Association, as Trustee, does not hold all rights to the mortgage loans free and clear of any encumbrance as represented in the PSAs and as required to obtain the benefits of priority, the right to foreclose, true sales, bankruptcy-remoteness, REMIC status, and other elements of properly formed RMBS trusts.

\*    \*    \*

49. The trust lacks the power to foreclose for all notes it holds in which the associated mortgages list an originating lender and MERS as nominee because the notes and mortgages have been severed. Severance of the note from the mortgage renders the note unsecured debt. . . .

\*    \*    \*

58. Consider a typical mortgage assignment from MERS to U.S. Bank recorded in the County Record[er] of Deeds for Washington County, PA in which the note attached to the mortgage had already purportedly been deposited in an RMBS trust administered by Defendant U.S National Bank, as Trustee, years before. See Exhibit C; Exhibit A, at p. 989 of 1830 (listing a mortgaged property in Donora, PA with a Note date of June 21, 2005 and an original balance of $58,000.00, matching the characteristics of the mortgage described in Exhibit C mortgage assignment). MORTGAGE ASSET-BACKED PASS THROUGH CERTIFICATES SERIES 2005-EFC3, administered by U.S. Bank as trustee, had a closing date of August 30, 2005. See Exhibit A, p. 26. The mortgage assignment

from MERS to U.S. Bank, in which the mortgage is attached to a note already purportedly deposited in the trust, is dated March 18, 2008. See Exhibit C. Defendant represented that, by 45 days after the closing date, it would review all documentation related to the mortgage loans to ensure that the Mortgage Files are complete and that they have been conveyed according to the Depositor's representations. See Exhibit A, pp. 67-68. Had all rights to the mortgage loans, free and clear of any encumbrance, truly been transferred by the trust's closing date of August 30, 2005, as Defendant represented, then this mortgage assignment would be unnecessary.

59. Plaintiff believes this assignment was made at the direction of U.S. Bank in preparation for U.S. Bank to initiate foreclosure. This assignment is fraudulent and void, however, because MERS, rather than the originating lender EquiFirst Corporation, is the assignor. As the assignment references, MERS is merely the nominee of EquiFirst. . . .

60. The prosecution of foreclosures in MERS' name, or after receiving an assignment to the trust from MERS, by Defendant when MERS lacked standing to prosecute foreclosures, or lacked the authority to assign mortgages to the trust for the trust to prosecute foreclosures, has drastic consequences for the Counties. Among other things, properties that have been foreclosed on by MERS, or by trusts following a fraudulent assignment from MERS, may lack clear title, thereby impacting both value and salability. This in turn has spillover impacts on neighboring properties' values. . . . As a result . . . , the Counties have dedicated, and will continue to dedicate, substantial services, time, and expense in determining the ownership rights of parties laying claim to these properties.

Complaint, (ECF No. 1-2), at ¶¶ 44-47, 49, 58-60.

Based on these allegations, County of Washington makes three common law claims: Count I, "Unjust Enrichment," which "seeks equitable remedies to prevent the unjust enrichment of Defendant by causing payment to Plaintiff and Plaintiff Class(es) of all mortgage assignment fees wrongfully avoided by the Defendant in addition to interest, attorneys' costs and fees, and exemplary damages as allowed by law and equity"; Count II, "Declaratory Judgment," which seeks a declaration that the mortgage notes held in RMBS trusts are "unsecured debt," by virtue of the failure to properly record the assignments and pay fees; and Count III, "Declaratory Judgment and Mandatory

Injunction," which seeks an injunction against foreclosures on properties in County of Washington with mortgage loans held by U.S. Bank in trust and channeled through MERS as part of the securitization process. Complaint, (ECF No. 1-2), at ¶¶ 67-91.

### 2. U.S. Bank's Notice of Removal

On November 3, 2011, U.S. Bank filed its Notice of Removal in this Court (ECF No. 1), pursuant to the removal statutes and under the original diversity jurisdiction of the federal courts. As grounds for removal, U.S. Bank asserts that it is a national bank with citizenship in Ohio,[2] where its principal place of business is located, that Plaintiff is considered a Pennsylvania citizen, and that the amount-in-controversy, although not specified in County of Washington's Complaint, nevertheless exceeds the diversity of citizenship jurisdictional threshold, $75,000. Taking the facts alleged in the Complaint as true solely for purposes of the Notice of Removal, U.S. Bank offers several theories why the amount-in-controversy exceeds the threshold.

First, U.S. Bank asserts that the amount-in-controversy is satisfied on the face of the Complaint alone. "Plaintiff alleges that the putative class consists of 'most, if not all of Pennsylvania's 67 counties' . . . , [that] 'over $100 million has been lost in recording fees' by the Plaintiff class, . . . ,' [and that] 'the Complaint . . . seeks more than $1.5 million in actual damages alone per putative class member (more than $100 million in alleged total actual damages divided by 67 Pennsylvania counties)' . . . ." Additionally, U.S. Bank figures that attorney fees would "conservatively," assuming a 27% fee on a class action judgment, increase "the amount-in-controversy for Plaintiff alone by at least $405,000 ($1.5 million times 27%)." Notice of Removal, (ECF No. 1), ¶¶ 11-16.

---

[2] See *Abulkhair v. Citibank and Assoc.*, 434 Fed.Appx. 58, 60 n.2 (3d Cir. 2011) (citing *Wachovia Bank v. Schmidt*, 546 U.S. 303, 318 (2006) (a national bank's citizenship is the state designated in its articles of incorporation as the locus of its main office)).

Second, U.S. Bank attempts to place a monetary value on declaratory relief "that would convert to unsecured debt any and all mortgage notes that list MERS as nominee." Citing the two exemplars Plaintiff referenced in the Complaint (mortgage loans for properties in Washington County with outstanding balances of $113,637 and $57,890, respectively), U.S. Bank concludes that "the value of the declaratory relief sought also independently satisfies the $75,000 amount-in-controversy requirement on behalf of Plaintiff." Presumably, Defendant is equating the outstanding balances on these mortgages with the negative value of a judgment declaring that the mortgages are unsecured, although it offers no explanation why unsecured loans would lose most or all of the value they hold as secured loans. Notice of Removal, (ECF No. 1), ¶¶ 17-20.

"Third, although the allegations of the Complaint alone demonstrate that the amount-in-controversy requirement is satisfied, additional information outside the Complaint further confirms that more than the amount-in-controversy requirement is established for Plaintiff." Notice of Removal, (ECF No. 1), ¶ 21. The "additional information outside the Complaint" is census-population data, upon which U.S. Bank calculates that County of Washington has about 1.6% of Pennsylvania's population, and that "even if Plaintiff attempts to argue that its estimated total actual damages at issue of over $100 million" should not be assumed to be divided equally between the Pennsylvania counties, Washington County's population reveals that the $75,000 amount-in-controversy requirement is still met" because 1.6% of $100 million is $1.6 million, and another 27% in attorney fees would increase the monetary damages to over $2 million. Notice of Removal, (ECF No. 1), ¶¶ 22-25.

The Court notes that U.S. Bank provides no support for its competing extrapolations (i.e., that the value of the monetary damages sought must be either $1.5 million plus fees, if you

divide $100 million by 67 counties, or $1.6 million plus fees, if you take 1.6% of $100 million), or what the basis for either *assumption* may be. Both assumptions indulge in speculation and conjecture about the distribution of MERS linked mortgages in U.S. Bank's portfolio throughout Pennsylvania, with no factual basis proffered for either assumption.

Finally, U.S. Bank asserts that, given that diversity jurisdiction is established with respect to the one named plaintiff, County of Washington, the Court may exercise supplemental jurisdiction over the claims of the remaining putative class members pursuant to 28 U.S.C. § 1367 and *Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 566-67 (2005).

### 3. County of Washington's Motion to Remand

Plaintiff filed a Motion to Remand (ECF No. 9) on December 5, 2011, arguing that Defendant "has failed to offer any thorough or detailed analysis of the value of Plaintiff's claims, and further grossly mischaracterizes the relief sought." Motion to Remand, (ECF No. 9), at ¶ 6. In its supporting brief, County of Washington asserts that U.S. Bank has failed to meet its burden of showing, by a preponderance of the evidence, that the amount-in-controversy exceeds $75,000. County of Washington points out that the Complaint estimates the approximate $100 million loss as the revenue loss to *all* 67 Pennsylvania counties by *all MERS members collectively* from using the MERS system instead of recording mortgage assignments with Pennsylvania county recorders. MERS has over 5000 member institutions, and Plaintiff's allegations and claims are directly solely to the conduct of just *one* of those 5,000 members.

The only concrete information about implicated mortgages in the County of Washington are the two mortgages Plaintiff offered as exemplars in its Complaint. At $52.50 per unrecorded assignment, the compensatory damages would amount to $210, at two transfers of beneficial

interests per mortgage loan, or $315, at three. Whether there are two or three assignments poses a material factual dispute on which the Court must make a finding of fact.

As to the value of exemplary damages and attorneys' fees, Plaintiff argues that there has been no showing of the availability or likelihood of any award of exemplary damages should it prevail, and that Defendant's Notice of Removal fails to provide the Court with "legal and factual tools to accomplish the task of translating claims for attorney fees and exemplary damages in monetary sums." Brief in Support of Motion to Remand, (ECF No. 10), at 12. Similarly, Plaintiff maintains that U.S. Bank has given the Court little to go on with regard to the monetary value of a declaratory judgment, and that in any event, County of Washington merely seeks a declaration *clarifying* that these mortgage notes are *already* unsecured, and therefore, the Complaint does not seek anything of added monetary value. The "value of the rights which the plaintiff seeks to protect," according to the County of Washington, is not the value of the notes, as Defendant asserts, but the value of the fees for mortgage assignments Defendant has failed to record.

### 4. U.S. Bank's Brief in Opposition to Motion to Remand to State Court

On January 20, 2012, U.S. Bank filed its Brief in Opposition to Motion to Remand. (ECF No. 16). In it, U.S. Bank first disputes Plaintiff's position regarding the burden of proving the amount-in-controversy, stating that Plaintiff is "confused" about the proper allocation of proof and jurisdictional standards. Brief in Opposition, (ECF No. 16), at 5. According to U.S. Bank, the proper allocation of burden of proof is as follows:

> A removing party must show "that the case is properly before the federal court." *Frederico v. Home Depot*, 507 F.3d 188, 193 (3d Cir. 2007).

The plaintiff is the master of the complaint, and therefore, in removal cases, "'determining the amount-in-controversy begins with a reading of the complaint filed in the state court.'" *Id*. at 197 (quoting *Samuel-Bassett v. KIA Motors America, Inc.,* 357 F.3d 392, 398 (3d Cir. 2004)). The fact that a complaint does not on its face state the amount it seeks to recover will not defeat diversity jurisdiction. *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 877 (3d. Cir. 1995). In situations where a plaintiff does not claim an amount certain, "a defendant's notice of removal serves the same function as the complaint would if filed in the district court." *Frederico*, 507 F.3d at 197.

When a plaintiff does not explicitly state an amount that it seeks to recover, the Third Circuit has outlined two different standards to guide a court in determining whether the amount-in-controversy is satisfied. The appropriate standard is determined by whether "the jurisdictional dispute surround[s] factual matters." *Frederico*, 507 F.3d at 194.

In cases where "disputes over factual matters are involved," a court should apply a preponderance-of-the-evidence standard "for resolving the dispute." *Id*. . . . In cases where "relevant facts are not in dispute," a court should apply the legal certainty" standard. *Frederico*, 507 F.3d at 194. This standard requires that the "challenger to subject matter jurisdiction . . . prove, to a legal certainty, that the amount-in-controversy could not exceed the statutory threshold." *Id*. at 195.

Brief in Opposition, (ECF No. 16), at 2-4.

U.S. Bank insists that there are no jurisdictional facts in dispute in this case, and therefore the burden is on Plaintiff to show to a legal certainty that the amount-in-controversy does not exceed $75,000. Brief in Opposition, (ECF No. 16), at 5.

Defendant next takes issue with Plaintiff's "disingenuous[ ] assert[ion] that the Court should look only to the filing fees associated with the two mortgages on Washington County properties that are part of the single residential mortgage-backed security ("RMBS") trust that Plaintiff attached to the Complaint, because such narrow reading of potential damages is "contrary to the Third Circuit's instruction that the amount-in-controversy should 'not be measured by the low end of an open-ended claim, but rather by a reasonable reading of the value

of the rights being litigated.' *Angus v. Shiley*, *Inc*., 989 F.2d 142, 146 (3d Cir. 1993)." Brief in Opposition, (ECF No. 16), at 6-7.

As to the proper valuation of County of Washington's claims, the Brief in Opposition completely abandons the theories featured in Defendant's Notice of Removal, and instead offers a purportedly fact-based analysis in the form of an affidavit from Irina Palchuk, a Vice-President of U.S. Bank, and a newspaper article in the Pittsburgh Tribune-Review published on November 11, 2011.[3] U.S. Bank explains the significance of the affidavit as follows:

> In response to Plaintiff's challenge to prove the amount-in-controversy requirement by reference to specific Washington County mortgages, U.S. Bank reached out directly to three major RMBS servicers, who service mortgages contained within RMBS trusts for which U.S. Bank acts as trustee. (Affidavit of Irina Palchuk in Support of U.S. Bank's Opposition to Plaintiff's Motion to Remand ("Palchuk Affidavit") at ¶¶ 2, 4, 6, attached hereto as Exhibit B). The business records of these three servicers alone – Wells Fargo Bank, N.A., Aurora Bank FSB and GMAC ResCap – evidence a total of 1,089 mortgages for which U.S. Bank serves as trustee in Washington County. (Ex. B, Palchuk Affidavit at ¶¶ 3, 5, 7). Plaintiff's Motion to Remand explains that, for each mortgaged property, the Complaint identifies two assignments that allegedly should have been recorded, totaling $105 per mortgaged property. (Remand Brief at p. 10). Thus, for these three servicers alone, the amount-in-controversy totals $114,345 (1,089 multiplied by $105), which amply satisfies the amount-in-controversy requirement under any applicable legal standard.

Brief in Opposition, (ECF No. 16), at 8.

For reasons that will become apparent, the Court notes that Lisa Lewis, an employee of Wells Fargo Bank, was the source of that master servicer's information that it "was able to identify 607 mortgages included in various RMBS trusts for which U.S. Bank serves as trustee in Washington County" which Wells Fargo services, and that Jerald Dreyer, an employee of Aurora

---

[3] In the article, the Washington County Recorder of Deeds is reported to have said that an estimate of alleged damages of approximately $1.6 million (as set forth in U.S. Bank's Notice of Removal) may in fact be low because the county "does not know how many times the mortgages were assigned to different investors." Brief in Opposition (ECF No. 16), at 7.

Bank FSB, the source of Aurora's information, "searched Aurora's business records for mortgages on properties located in Washington County and determined there are 282 mortgages for which U.S. Bank serves as trustee in Washington County and which Aurora master-services." Brief in Opposition, Ex. B, Palchuk Affidavit, (ECF No. 16-2) at ¶¶ 2-5.

### 5. Reply Memorandum in Support of Motion to Remand

County of Washington filed a Reply Memorandum in Support of its Motion to Remand (ECF No. 19). In it, County of Washington responds that U.S. Bank's "Opposition to Motion to Remand Action to State Court abandons the original rationales for asserting federal jurisdiction. In their stead, Defendant now offers a lengthy misstatement of the relevant legal standard, an affidavit containing information so vague and imprecise that it is of virtually no assistance in determining the amount-in-controversy, and a newspaper article that is inadmissible." Reply Memorandum (ECF No. ) 19), at 2.

County of Washington correctly notes that there are obvious, dispositive factual disputes in this case, chief among them being: (1) how many County of Washington mortgage loans does U.S. Bank hold in trust under the MERS reassignment/ RMBS investment structure, and (2) how many assignments were there for each such mortgage, for which recording fees were avoided. Plaintiff also makes a hearsay based objection to any consideration of the newspaper article, and has serious substantive and procedural objections to the Palchuk affidavit, including that "the affidavit does not distinguish between non-MERS mortgages and MERS mortgages," as Plaintiff's Complaint quite explicitly does, and that the Palchuk affidavit appeared to be just a summary of information from some of U.S. Bank's servicers, and "does not even contain enough

information to draw reasonable inferences that a high proportion of the mortgages counted are MERS mortgages." Reply Memorandum, (ECF No. 19), at 5-6.

### 6. Defendant's Surreply

In its Surreply in Opposition to Motion to Remand Action to State Court (ECF No. 20), U.S. Bank counters Plaintiff's contention that the affidavit relied upon by U.S. Bank in its Opposition to Plaintiff's Motion to Remand fails to distinguish between MERS and non-MERS mortgages, and argues that the newspaper article attached to its previous submission is admissible as an admission by a party opponent. *See* Fed.R.Evid. 801(d)(2)(D). U.S. Bank argues that "Plaintiff's speculative analysis of percentages of MERS mortgages should be disregarded because it is belied by a simple review of publicly filed documents related to RMBS trusts, in particular the prospectus supplement for the RAMP Series 2005-EFC3 trust – the very RMBS trust that Plaintiff attached to its Complaint and repeatedly references in its Motion for Remand and its Reply." Surreply, (ECF No. 20), at 2. Steadfastly standing by Ms. Palchuk's affidavit, U.S. Bank asserts that the prospectus supplement to the RAMP Series 2005-EFC3 trust "contains a section called 'Description of the Mortgage Pool,' which states that 'As of the cut-off date, approximately 99.6%, 99.9% and 99.8% of the Group I Loans, Group II Loans and all mortgage the very RMBS trust that Plaintiff attached to its Complaint and repeatedly references in its Motion for Remand and its Reply. The Series 2005-EFC3 trust loans, respectively, were recorded in the name of MERS.'" Surreply, (ECF No. 20), at 2.

Beyond that, U.S. Bank insists that County of Washington has the burden of proving to a legal certainty that the amount-in-controversy is less than $75,000, and pointedly criticizes Plaintiff's statement of the appropriate burden of proof as being on Defendant to prove by a

preponderance of the evidence that the amount is in excess of the jurisdictional threshold. Surreply, (ECF No. 20), at 2. ("Beyond its failed attempts to attack U.S. Bank's affidavit, Plaintiff's Reply contains additional wrong assertions that U.S. Bank feels compelled to briefly address and correct. Plaintiff first incorrectly asserts that U.S. Bank offered 'a lengthy misstatement of the relevant legal standard.' . . . Plaintiff, however, cites no legal authority that would suggest that the standard U.S. Bank set forth in its Opposition was incorrect. Instead of pointing to any legal authority, Plaintiff makes a number of general observations regarding its belief in the existence of a factual dispute such that the preponderance of the evidence standard should be the appropriate standard for the Court to apply in the instant circumstances. However, the standard for determining whether a factual dispute exists is quite clear within the Third Circuit, and Plaintiff's Reply blatantly disregards that standard. . . . For the reasons set forth herein and in U.S. Bank's Opposition, the prevailing legal standard requires that Plaintiff must establish to a legal certainty that it cannot recover more than the jurisdictional minimum of $75,000.").

Although it acknowledges that, where there are disputes over factual matters related to jurisdiction, the party asserting jurisdiction has to show jurisdiction by a preponderance of the evidence (*see, e.g. Frederico v. Home Depot*, 507 F.3d 188, 194 (3d Cir. 2007)), U.S. Bank continues to maintain there is no factual dispute about the amount-in-controversy in this case. On the pleadings before the Court, that position is indefensible. If there *ever* was a factual dispute about the amount-in-controversy, the dispute herein about how many implicated mortgage loans held in RMBS trusts by U.S. Bank for Washington County properties and the number of assignments made with each such loan as part of the securitization process is it.

## 7. Jurisdictional Discovery

County of Washington filed an unopposed Motion Requesting Oral Argument (ECF No. 25) on its Motion to Remand, which this Court denied as moot on March 5, 2012. On March 8, 2012, in light of the great discrepancy in the respective positions of the parties with regard to amount-in-controversy and the major factual disputes underpinning their difference of opinion, the Court entered an Order authorizing the parties to "engage in limited jurisdictional discovery on the amount-in-controversy component of diversity of citizenship, removal jurisdiction under 28 U.S.C. §§ 1332 and 1441(b). This discovery shall be completed by May 7, 2012, unless otherwise directed by the Court." (ECF No. 28).[4]

At the request of the parties, the Court extended the jurisdictional discovery period until May 18, 2012, and directed the parties to file supplemental briefs.

From Ms. Palchuk's affidavits and evidence introduced at the evidentiary hearing, it seems there was little or no actual discovery directed to opposing parties, but rather, the discovery period was used by U.S. Bank for internal investigating, information gathering, research of public records and preparation of spreadsheets/ summary charts for the hearing.

### 8. Supplemental Post-Discovery Briefs in Support and in Opposition

#### a. Defendant U.S. Bank National Association's Supplemental Brief In Opposition To Motion To Remand Action To State Court (ECF No. 29)

In its Supplemental Brief, U.S. Bank states its position as follows:

> The only remaining open issue with regard to diversity jurisdiction is whether the amount-in-controversy requirement for diversity jurisdiction is satisfied. Toward the end of resolving that issue, U.S. Bank devoted

---

[4] When issues arise as to jurisdiction, "discovery is available to ascertain the facts bearing on such issues." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n. 13 (1978). The Court of Appeals for the Third Circuit has said that if "the plaintiff's claim is not clearly frivolous, the district court should ordinarily allow discovery on jurisdiction in order to aid the plaintiff in discharging that burden." *Compagnie Des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 362 (3d Cir. 1983).

substantial time and resources to conduct discovery on this issue, engaging
in a process that collected relevant information from multiple sources—
from U.S. Bank itself, from multiple third-parties, and from publicly
available documents and records. [footnote omitted] See Affidavit of Irina
Palchuk, Exhibit A hereto. As a result of this effort, U.S. Bank identified
no less than 715 mortgages in Washington County that name . . . MERS . .
. . as mortgagee and also secure loans in . . . RMBS . . . trusts for which
U.S. Bank acts as trustee. This discovery definitively satisfies the amount-
in-controversy requirement. Consequently, Plaintiff's Motion to Remand
must be denied.

Supplemental Brief, (ECF No. 29), at 1-2.

U.S. Bank also offers argument and points to evidence to support its position that
there are three assignments that, according to Plaintiff's theory, should have been
recorded per mortgage loan. U.S. Bank does not, however, explain how its previous
estimate of 1089 County of Washington related mortgage loans held in trust by U.S.
Bank as set forth in Ms. Palchuk's previous affidavit shrank to the current 715 mortgage
loans now found by Ms. Palchuk in her current affidavit. That is, there is no explanation
what happened to the other 374 affected loans that U.S. Bank initially uncovered by its
internal investigation and information supplied by three of its "servicers" in the chain of
title, Wells Fargo, Aurora Bank, and GMAC ResCap. Affidavit of Irina Palchuk, (ECF
No. 16-2).

### b. Plaintiff's Supplemental Reply Memorandum In Support Of Motion To Remand (ECF No. 31)

County of Washington's supplemental brief argues that U.S. Bank relies almost
exclusively on the Palchuk affidavit, "featuring a summary chart, that cannot be considered by
this court because the supporting documentation was not made available to Plaintiff and because
the supporting documentation is inadmissible as hearsay. . . .  Because this is the only evidence
offered to show that the amount-in-controversy has been met, the suit should be remanded to the
Court of Common Pleas of Washington County, Pennsylvania."  (ECF No. 31), at 2.

### 9.  Memorandum Order of June 14, 2012, Granting Joint Motion for Oral Argument and Scheduling Evidentiary Hearing

On June 14, 2012, this Court entered a Memorandum Order (ECF No. 34) granting the

parties' joint request for oral argument on the Motion to Remand.  The Memorandum Order also

stated as follows:

> After careful review of the supplemental briefs and the affidavits accompanying them, [ECF Nos. 29, 31, 32], the Court finds that although the amount-in-controversy landscape has shifted considerably, there remains a substantial factual dispute whether the amount-in-controversy is over or under the jurisdictional threshold.
>
> On June 11, 2012, the parties filed a Joint Motion Requesting Oral Argument On Plaintiff Washington County's Motion To Remand [ECF No. 33].  The Court agrees that oral argument would be helpful and will grant this motion.
>
> Additionally, the Court will conduct an evidentiary hearing to consider any admissible evidence the parties wish to produce at that time, including the documentary evidence underlying the Affidavit of Irina Palchuk, a Vice President of U.S. Bank, and the summary spreadsheet attached to Ms. Palchuk's affidavit.  The affidavit and spreadsheet attest to 715 mortgages in Washington County that name MERS as mortgagee and also secure loans in RMBS trusts for which U.S. Bank acts as trustee.  Exhibit A to Defendant U.S. Bank National Association's Supplemental Brief In Opposition To Motion To Remand Action To State Court [ECF No. 29].  Depending on whether one assumes two recordable transactions for each such mortgage or three (a fact which also is disputed), the aggregate of the fees lost by Washington County is $75,075.00 or $112,612.50, without regard to any punitive damages, attorney fees or value to be placed on plaintiff's requests for equitable relief.  Washington County disputes that there should be three $52.50 transaction fees calculated for each of the 715 such mortgages, and maintains that, after "over eight months of attempting to show that removal to federal court was proper, including the filing of a notice of removal, an opposition brief to Plaintiff's Motion to Remand, a surreply, and, finally, a supplemental opposition brief following over two months of jurisdictional discovery, Defendant has still failed to carry its burden of demonstrating that the amount-in-controversy has been met."  Plaintiff's Supplemental Reply Memorandum In Support Of Motion To Remand [ECF No. 31, at 1].  Washington County also challenges the Palchuk affidavit as insufficient to establish the threshold amount-in-controversy.  ("Defendant's latest effort to carry its burden relies almost exclusively on an affidavit, featuring a

summary chart, that cannot be considered by this court because the supporting documentation was not made available to Plaintiff and because the supporting documentation is inadmissible as hearsay. Further, the affiant has made statements in the affidavit that appear to contradict Defendant's own conduct, casting doubt on the affidavit's credibility." [ECF No. 31, at 2].

As far as the underlying documentation is concerned, plaintiff's counsel requested information by which he could independently verify Ms. Palchuk's conclusions and her spreadsheet summary, but was rebuffed by U.S. Bank. U.S. Bank's position with regard to the underlying documentation is as follows:

> The information that U.S. Bank gathered and compiled includes data implicating privacy concerns for third-party borrowers and raises issues under the privacy provisions of the Gramm-Leach-Bliley Act. U.S. Bank is willing to present testimony and provide the documents for an in camera review by the Court to confirm the information presented in the affidavit. However, absent a court order, U.S. Bank believes that it is not authorized to disclose such information and that any such disclosure may not be in the interests of the individual homeowners. Further, U.S. Bank respectfully suggests that it would be unnecessary and inadvisable to permit the documents to be put into the record or to be copied by, or be in the physical possession of, Plaintiff's counsel due to the above-described concerns. Of course, U.S. Bank will comply with whatever the Court might order it to do in this regard.

Defendant U.S. Bank National Association's Supplemental Brief In Opposition To Motion To Remand Action To State Court [ECF No. 29, at 7, n.5].

While the Court appreciates U.S. Bank's concerns, plaintiff is correct that it is entitled to see the underlying documentation upon which a summary chart or spreadsheet is predicated. See Fed.R.Evid. 1006 ("The proponent may use a summary, chart, or calculation to prove the content of voluminous writings . . . that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.").

The Court will schedule an evidentiary hearing and argument, therefore, and will direct U.S. Bank to make available for inspection or photocopying by Washington County all relevant documentation underlying Ms. Palchuk's affidavit, quite confident that counsel will be

able to craft an appropriate Joint Motion for Protective Order that will assuage U.S. Bank's concerns.

To be clear, where there are disputes over factual matters related to jurisdiction, the party asserting federal court jurisdiction – here U.S. Bank -- has the burden to demonstrate it by a preponderance of the evidence. *Frederico v. Home Depot*, 507 F.3d 188, 194 (3d Cir. 2007). Despite U.S. Bank's vigorous protestations to the contrary, the complicated factual arguments it makes to convince this Court that more than $75,000 is at stake demonstrate that there remains a substantial dispute of facts on that issue. Accordingly, the burden of proof and persuasion at the hearing and on this issue will be on U.S. Bank to show, by a preponderance of the evidence, that the value of Washington County's claims exceeds $75,000.00.

Memorandum Opinion of June 14, 2012, (ECF No. 34), at 3-6.

### 10. July 2, 2012 Evidentiary Hearing

The only witness called at the evidentiary hearing of July 2, 2012 was U.S. Bank Vice President Irina Palchuk, an attorney and account manager in the Global Corporate Services Trust Group, a loan default litigation group, who had submitted the two affidavits. *See* Notes of Testimony, July 2, 2012, (ECF No. 38) (currently under seal). Ms. Palchuk requested and "oversaw the gathering of information" upon which U.S. Bank relies in attempting to shoulder its burden of proof, gathered both internally and externally, from the records kept by U.S. Bank, MERS, Landex (an online public record of recorded documents which U.S. Bank's lawyers examined), and five of its servicers or master servicers - Wells Fargo, Aurora, Ocwen Financial Corporation, Bank of America and GreenPoint Mortgage. (Although her previous affidavit indicated that she received similar information gathered in a similar way from another servicer, GMAC ResCap, who found 200 such County of Washington - U.S. Bank trust held mortgage loans, GMAC ResCap's mortgage loan numbers are no longer in the equation. Brief in Opposition, Ex. B, Palchuk Affidavit, (ECF No. 16-2) at ¶¶ 6-7.)

The "internal documents" that informed her affidavit were spreadsheets prepared by a U.S. Bank employee who regularly downloads information from the MERS system under U.S. Bank's trustee organizational ID, and a spreadsheet provided by U.S. Bank's Investor Reporting Group.

The external information gathering came primarily from the servicers and master servicers for U.S. Bank's RMBS trusts, which Ms. Palchuk described as its "major source," "most accessible," and "most reliable source of current loan information" because servicers are obligated to maintain loan lists, manage collections and administrate the loans, and provide reporting to U.S. Bank on a "loan-to-loan basis" when necessary for foreclosure litigation. U.S. Bank itself does not have records on every loan in its various RMBS trusts, and had to rely on the information supplied by the various sources upon Ms. Palchuk's request. Most of the information, and all of the information supplied by servicers, was in the form of spreadsheets setting forth names of mortgagors and addresses and, in some cases, trusts that had been harvested by employees of the servicers from their internal business records. Ms. Palchuk had no idea what kind of underlying records those servicers kept, and could not speak to how those records are kept. Ms. Palchuk's affidavits, as well as her testimony, are fairly vague about the "certain information maintained" by the various servicers and the business records from which they "gathered" their mortgage loan numbers, and she had no personal knowledge about any of their record keeping methods or procedures.

The critical spreadsheet, marked as Defendant's Exhibit D2, lists 715 addresses in County of Washington, mortgage amounts for the properties listed, identifying "MIN" numbers, and the sources of the information. According to U.S. Bank and Ms. Palchuk, these 715 properties have mortgage loans held in trust by U.S. Bank in the County of Washington. Ms.

Palchuk stated that her information from the servicers was supplied by spreadsheets, and that the U.S. Bank spreadsheet at D2 is a compilation of the various servicer's spreadsheets. She did not see any of the underlying documentation or records upon which the employees of the various servicers gleaned the information that generated their respective spreadsheets. All of the spreadsheets including Exhibit D2, the "compilation" spreadsheet, were prepared at her request specifically in preparation for this litigation and evidentiary hearing.

Ms. Palchuk testified that the attorneys' search of the Landex public records disclosed about 100 loans on land in County of Washington in which U.S. Bank held the notes in an RMBS trust. Plaintiff does not dispute the accuracy of the Landex numbers or the reliability of the search conducted by U.S. Bank's attorneys.

U.S. Bank also produced certifications of authenticity by two of its servicers, Wells Fargo and Aurora. Jerald Dreyer, an employee of Aurora Bank FSB, certified that, at U.S. Bank's request, he "prepared a spreadsheet containing information about mortgage loans secured by property in Washington County, Pennsylvania, that are in trusts for which U.S. Bank National Association serves as trustee," and that he obtained the information on this spreadsheet from records kept by Aurora in the ordinary course of business," as a regular practice of Aurora in its capacity as master servicer for U.S. Bank. Plaintiff's Exhibit 1. Lisa Lewis, an employee of Wells Fargo, submitted an identical certification on behalf of Wells Fargo. Defendant's Exhibit D5.

Ms. Palchuk was not familiar with the records to which Mr. Dreyer and Ms. Lewis referred, had not seen them, did not know what they were, and did not request to see them.

As noted, the master spreadsheet, Exhibit D2, lists 715 affected properties and mortgage notes in County of Washington, including 143 mortgage loans identified by Wells Fargo and 73 such loans identified by Aurora. *See* Post-hearing Submission by Defendant U.S. Bank National Association, (ECF No. 37), at 3-4. Ms. Palchuk and U.S. Bank consider the information supplied by its servicers and master servicers to be the most accurate, reliable and accessible information it can gather regarding the number of its notes on County of Washington properties held in an RMBS trust. Ms. Palchuk did not explain, and U.S. Bank did not offer any evidence or argument to explain, why Wells Fargo and Aurora, by these same employees, had previously gathered information from searches of their ordinary business records from which they located 607 County of Washington/ U.S. Bank mortgage loans (Wells Fargo) and 282 County of Washington/ U.S. Bank mortgage loans (Aurora), and why U.S. Bank was no longer using those numbers. Brief in Opposition, Ex. B, Palchuk Affidavit, (ECF No. 16-2) at ¶¶ 2-5. Nor does Ms. Palchuk or U.S. Bank explain why her previous affidavit concluded, from three servicers, that there were 1089 properties in County of Washington meeting the County of Washington/ U.S. Bank mortgage loan criteria, while U.S. Bank's current figures dropped to 715 properties in County of Washington meeting the County of Washington/ U.S. Bank mortgage loan criteria from seven different sources, internal and external, including Wells Fargo, Aurora and three other servicers.

## B. Discussion of Law

### 1. Removal Jurisdiction

Although the federal judiciary is a co-equal branch of government under Article III of the Constitution of the United States, federal court jurisdiction is limited and strictly defined by

Congress, and accordingly, it is a "bedrock principle that federal courts have no jurisdiction without statutory authorization." *Exxon Mobile Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 543, 553 (2005). Removal of state court actions into federal court is governed by 28 U.S.C. Section 1441, which provides: "(a) Generally. -- Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). Original jurisdiction includes diversity of citizenship pursuant to 28 U.S.C. § 1332(a), and some removal parameters in diversity cases are set out in 28 U.S.C. § 1441(b).

Section 1441 must "be strictly construed against removal, *Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990), so that the Congressional intent to restrict federal diversity jurisdiction is honored. This policy 'has always been rigorously enforced by the courts.' *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938)." *Samuel–Bassett v. KIA Motors America, Inc.*, 357 F.3d 392, 396 (3d Cir. 2004). *See* also *Meritcare Inc. v. St. Paul Mercury Ins. Co.*, 166 F.3d 214, 217 (3d Cir. 1999) (citing, *inter alia, Nelson v. Keefer*, 451 F.2d 289, 293-95 (3d Cir. 1971) (federal judiciary has been "too timid" in eliminating the "plethora of cases which do not belong in federal courts")). "Because lack of jurisdiction would make any decree in the case void and the continuation of the litigation in federal court futile, the removal statute should be strictly construed and all doubts resolved in favor of remand." *Brown v. Francis*, 860, 864-65 (3d Cir. 1996) (quoting *Abels v. State Farm Fire & Cas. Co.*, 770 F.2d 26, 29 (3d Cir. 1985)). *See also Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 851 (3d Cir. 1992).

Moreover, a federal court has a continuous obligation to satisfy itself of its subject matter jurisdiction, and should do so *sua sponte* if the parties have not flagged the issue. *Samuel-Bassett*, 357 F.3d at 395. *See also Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 418 (3d Cir. 2010) ("when there is a question as to our authority to hear a dispute, 'it is incumbent upon the courts to resolve such doubts, one way or the other, before proceeding to a disposition on the merits.'") (internal citation omitted)); *Frett–Smith v. Vanterpool*, 511 F.3d 396, 399 n. 3 (3d Cir. 2008) (discussing a court's obligation to dismiss the action if at any point it discovers that it lacks subject matter jurisdiction).

The Court "must always be suspicious of its subject-matter jurisdiction" because "federal courts are courts of limited jurisdiction, and there is no presumption that they have subject matter jurisdiction to adjudicate a particular case." *Martin v. Wal-Mart Stores, Inc.,* 709 F.Supp.2d 345, 346 (D.N.J. 2010) (citing *Wright & Miller*, 5 Fed. Prac. & Proc. Civ. § 1206 (3d ed.West 2010)). A federal court that entertains a case for which it has no subject matter jurisdiction commits "no mere technical violation; it is nothing less than an unconstitutional usurpation of state judicial power. Accordingly, there is a presumption that a federal court lacks subject matter jurisdiction, and the party seeking to invoke federal jurisdiction must affirmatively allege the facts supporting it." *Martin*, 709 F.Supp.2d at 346 (citing *Wright & Miller*, 13 Fed. Prac. & Proc. Civ. § 3522 (3d ed.West 2010)).

## 2. Diversity of Citizenship

U.S. Bank claims the jurisdiction of the federal courts over the state court action on the basis of diversity of citizenship pursuant to 28 U.S.C. Section 1332, which provides: "(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy

exceeds the sum or value of $75,000, exclusive of interest and costs, and is between -- (1) citizens of different States; . . ." 28 U.S.C. § 1332(a)(1).

For diversity of citizenship jurisdiction to exist, Section 1332(a)(1) requires first that the controversy be between "citizens of different States" where the parties are American citizens. 28 U.S.C. § 1332(a)(1). Thus the party asserting jurisdiction in federal court "must specifically allege each party's citizenship, and these allegations must show that the plaintiff and defendant are citizens of different states." *American Motorists Ins. Co. v. American Emp'rs Ins. Co.*, 600 F.2d 15, 16 (5th Cir. 1979); *see also Universal Reins. Co., Ltd. v. St. Paul Fire & Marine Ins. Co.,* 224 F.3d 139, 141 (2d Cir. 2000) ("The failure to allege [the party's] citizenship in a particular state is fatal to diversity jurisdiction"). Complete diversity must exist between the adverse parties in the action; that is, the citizenship of each plaintiff must be diverse from that of each defendant. *See Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373–74 (1978).

The County of Washington and U.S. Bank agree that there is complete diversity of their respective citizenship, and they agree that the sole issue before the Court is whether the second element of diversity jurisdiction, amount-in-controversy, has been established.

A determination of the amount in controversy "begins with a reading of the complaint filed in the state court." *Frederico v. Home Depot*, 507 F.3d 188, 197 (3d Cir. 2007). See also *Levy v. Weissman*, 671 F.2d 766, 767 (3d Cir. 1982). "The allegations on the face of the complaint control the amount in controversy unless it appears 'to a legal certainty the claim is really for less than the jurisdictional amount . . . .'" *Horton v. Liberty Mut. Ins. Co*., 367 U.S. 348, 353 (1961) (quoting *Red Cab*, 303 U.S. at 289).

The defendant's right to remove is determined according to the plaintiff's pleading at the time of the petition for removal. *Angus v. Shiley*, 989 F.2d 142, 145 (3d Cir. 1993); *see also Meritcare*, 166 F.3d at 217 ("Even though actual damages may not be established until later in the litigation, the amount in controversy is measured as of the date of removal."). The Court's inquiry must focus on facts that existed at the time the complaint was filed. *Kaufman v. Allstate New Jersey Ins. Co.*, 561 F.3d 144, 151 (3d Cir. 2009). Accordingly, courts considering a motion for remand "must focus on the plaintiff's complaint at the time the petition for removal was filed," and "must accept as true all factual allegations in the complaint." *Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987).

Events subsequent to filing the complaint that reduce the amount in controversy below the statutory minimum set forth in 28 U.S.C. § 1332 do not, ordinarily, require dismissal. *State Farm Mutual Auto. Ins. Co. v. Powell*, 87 F.3d 93, 97 (3d Cir. 1996). However, a "distinction must be made between subsequent events that change the amount in controversy and subsequent revelations that, in fact, the required amount was or was not in controversy at the commencement of the action." *Meritcare*, 166 F.3d at 217–218 (quoting *Powell*, 87 F.3d at 97). The "subsequent revelation" exception (i.e., subsequent revelations show there was never jurisdiction in the first place) allows courts to look beyond the allegations of the complaint when subsequent events reveal that the amount actually in controversy at the time of filing was less than the threshold amount. *See Carlisle v. Matson Lumber Co.*, 186 Fed.Appx. 219, 226 (3d Cir. 2006).

**3**.        **Amount in Controversy**

Uncertainty arises where, as here, the complaint is for an indeterminate amount or seeks relief other than monetary damages, in whole or in part. Where the complaint does not limit its

request for damages to a precise monetary amount, the court may look to the notice of removal, and should make an independent evaluation of the value of the claim from the record before it, i.e., the state court records, including the complaint, and the removal notice. *Angus,* 989 F.2d at 146; *Penn v. Wal–Mart*, 116 F.Supp.2d 557, 561 (D.N.J. 2000). In removal cases, the notice of removal may serve the same function as the Plaintiff's Complaint for purposes of determining amount in controversy. *Morgan v. Gay*, 471 F.3d 469, 474 (3d Cir. 2006) ("[b]ecause the complaint may be silent or ambiguous on one or more of the ingredients needed to calculate the amount in controversy, a defendant's notice of removal serves the same functions as the complaint would in a suit filed in federal court." (internal quotation marks omitted)).

"[E]stimations of the amounts recoverable must be realistic." *Samuel–Bassett*, 357 F.3d at 403. "The inquiry should be objective and not based on fanciful, pie-in-the-sky, or simply wishful amounts, because otherwise the policy to limit diversity jurisdiction will be frustrated." *Id.* (internal quotation marks omitted). "The court must measure the amount 'not by the low end of an open-ended claim, but rather by a reasonable reading of the value of the rights being litigated.'" *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 666 (3d Cir. 2002) (quoting *Angus*, 989 F.2d at 146). The amount in controversy requirement is narrowly construed to fulfill the Congressional purpose of "keep[ing] the diversity caseload of the federal courts under some modicum of control." *Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1044-45 (3d Cir. 1993).

A district court should not consider claims based on speculation or conjecture when determining the amount in controversy. *Columbia Gas Transmission Corp. v. Tarbuck*, 62 F.3d 538, 543-44 (3d Cir. 1995) (citing *Kheel v. Port of New York Auth.*, 457 F.2d 46, 49 (2d Cir.) (the "jurisdictional test is applicable to that amount that flows directly and with a fair degree of

probability from the litigation, not from collateral or speculative sources"), *cert. denied*, 409 U.S. 983 (1972).

The Third Circuit assesses the amount in controversy from the viewpoint of the plaintiff. *Tarbuck*, 62 F.3d at 539 (in action for injunctive relief, amount in controversy is measured "by the value of the rights which the plaintiff seeks to protect"). Additionally, the Supreme Court has held that "[i]n actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 347 (1977), so that the amount in controversy in *Hunt* was determined by the losses the members of the respondent apple-growers association would incur from the challenged statute. *Id.*; *In re Corestates Trust Fee Litig.*, 39 F.3d 61, 65 (3d Cir.1994) ("In the Third Circuit, for actions seeking an injunction, it is settled that the amount in controversy is measured by the value of the right sought to be protected by the equitable relief.")). *See also Wright & Miller*, 14AA Fed. Prac. & Proc. Juris. § 3708 (4th ed. West 2011), Amount-in-Controversy in Particular Cases - Proceedings for Injunctive and Declaratory Relief. ("[A]mount in controversy is to be measured for subject matter jurisdiction purposes by the value of the right that the plaintiff seeks to enforce or to protect against the defendant's conduct or the value of the object that is the subject matter of the action. Accordingly, . . . when a person seeks an injunction or other form of specific relief, such as specific performance, it is the value to the plaintiff to enjoy the property business, or personal affairs that constitute the subject of the action free from the activity sought to be enjoined or the benefit of the conduct requested to be mandated that is the yardstick . . . . With regard to actions seeking declaratory relief, the amount in controversy is the value of the right or the viability of the legal claim to be declared, such as a right to indemnification or a duty to defend.").

Where the value of the requested injunction or declaratory relief is too uncertain or speculative, the court may decline to ascribe a value to the equitable relief and may decline to consider such relief in calculating the amount in controversy. *See, e.g.*, *Morrison v. Allstate Indem. Co.,* 228 F.3d 1255 (11th Cir. 2000) (value of injunctive relief to individual class members is "too speculative and immeasurable" to be included in amount in controversy calculation); *AT & T Corp., v. Austal, USA, L.L.C.*, 2006 WL 295393, *3 (S.D. Ala. 2006) (plaintiff who bases diversity jurisdiction on value of injunctive relief must show that benefit to be obtained from injunction is sufficiently measurable and certain to satisfy requirement); *Columbia Gas Transmission Corp. v. Meadow Preserve York, LLC*, 2006 WL 1376912 (N.D. Ohio 2006) (claim for injunctive relief not sufficiently measurable and certain to satisfy amount in controversy requirement); *Dimich v. Med-Pro, Inc.*, 304 F. Supp. 2d 517 (S.D. N.Y. 2004) (benefits from injunction for medical monitoring program is too speculative); *Gonzalez v. Fairgale Properties Co., N.V.*, 241 F. Supp. 2d 512 (D. Md. 2002) (value of declaratory relief is too speculative to be included in calculation). "While the fact that equitable relief may not be capable of exact valuation will not negate federal jurisdiction, if the matter is incapable of being reduced to a pecuniary standard of value, jurisdiction cannot be predicated upon 28 U.S.C. § 1332." *Stoller v. Nissan Motor Corp. in U.S.A.*, 934 F. Supp. 423 (S.D. Fla. 1996) .

Although a purported class action, this case was not removed pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub.L. No. 109–2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.) because the number of putative class members is less than the CAFA numerosity threshold of 100. 28 U.S.C. § 1332(d)(5)(B). As a non-CAFA class action, the claims of the multiple defendants may not be aggregated to reach the amount-in-controversy threshold, but if one of the putative class members claims exceed $75,000, diversity jurisdiction will exist.

CAFA abrogated the rule against aggregating claims to reach the jurisdictional minimum for federal court jurisdiction. *Allapattah Servs.,* 545 U.S. at 571; 28 U.S.C. § 1332(d)(6). Before the enactment of the CAFA, and for class actions excluded from the reach of CAFA, a federal court could/ can not exercise diversity jurisdiction as to a class action unless at least one named plaintiff had/ has a claim worth more than $75,000, exclusive of interest and costs. *Allapattah Servs.,* 545 U.S. at 558–59; *Snyder v. Harris*, 394 U.S. 332, 336–37 (1969).

Claims for punitive or exemplary damages may be aggregated with compensatory damages in determining the amount in controversy, unless they are "patently frivolous and without foundation." *Golden ex rel. Golden v. Golden*, 382 F.3d 348, 355 (3d Cir. 2004) (quoting *Packard*, 994 F.2d at 1046). Punitive damages claims are patently frivolous and without foundation if such damages are unavailable as a matter of state substantive law. *Id.*

Where attorneys' fees are recoverable under statute, they also should be included in the amount in controversy and not excluded as costs. *Suber v. Chrysler Corp.,* 104 F.3d 578, 585 (3d Cir.1997); *see also Missouri State Life Ins. Co. v. Jones*, 290 U.S. 199, 202 (1933). Although 28 U.S.C. § 1332 excludes "interest and costs" from the amount in controversy, attorneys' fees are "necessarily part of the amount in controversy if such fees are available to successful plaintiffs under the statutory cause of action." *Id.*

4.    **Burden of Proof**

Until recently, allocation of the burden of proving or disproving the requisite amount-in-controversy was a murky area, despite substantial efforts by the Court of Appeals for the Third Circuit to clarify seemingly conflicting standards ("legal certainty" and "preponderance of the evidence") that had arisen from two lines of United States Supreme Court caselaw.  In *Frederico v. Home Depot*, the Court of Appeals for the Third Circuit discussed and reconciled the *Samuel-Basset* and *Gay* decisions, which continued to produce some inconsistent results within the Circuit.[5]

It appears that any lingering confusion has been addressed and, hopefully, dispelled by Congress. In December 2011, Congress enacted the Federal Courts Jurisdiction and Venue Clarification Act of 2011, PL 112-63, December 7, 2011, 125 Stat. 758, which endorsed the preponderance of the evidence standard in the newly enacted Section 1446(c)(3) in Title 28. Section 1446(c) explicitly provides, in relevant part:

> (c) Requirements; removal based on diversity of citizenship.
>
> . . .

---

[5]  *See Martin v. Wal-Mart Stores, Inc.*, 709 F.Supp.2d 345, 349 n.4 (D.N.J. 2010). According to *Frederico*, *Morgan* applies when the complaint specifically states that the amount sought is less than the jurisdictional minimum. In that case, a defendant seeking removal must prove to a legal certainty that the plaintiff can recover the jurisdictional amount. *Samuel-Bassett*, on the other hand, applies where the plaintiff has not specifically alleged that the amount in controversy is less than the jurisdictional threshold.  In that case, the matter will be remanded if it appears to a legal certainty that the plaintiff cannot recover the jurisdictional amount. However, where the complaint does not specifically allege that the amount in controversy is less than the jurisdictional amount, a court must first determine whether there are disputes over factual matters relevant to establishing jurisdiction. *Frederico*, 507 F.3d at 194. Where there are factual disputes regarding the amount in controversy, the removing defendant must prove, by a preponderance of the evidence, the facts establishing that the amount in controversy exceeds the jurisdictional threshold. *Chrin v. Ibrix, Inc*., 293 Fed. App'x 125, 127 (3d Cir.2008) (citing *Frederico*, 507 F.3d at 194); *Samuel–Bassett*, 357 F.3d at 398. If the defendant fails to meet this burden, the case will be remanded.

(2) If removal of a civil action is sought on the basis of the jurisdiction conferred by section 1332(a), the sum demanded in good faith in the initial pleading shall be deemed to be the amount in controversy, except that--

(A) the notice of removal may assert the amount in controversy if the initial pleading seeks--

(i) nonmonetary relief; or

(ii) a money judgment, but the State practice either does not permit demand for a specific sum or permits recovery of damages in excess of the amount demanded; and

(B) *removal of the action is proper* on the basis of an amount in controversy asserted under subparagraph (A) *if the district court finds, by the preponderance of the evidence, that the amount in controversy exceeds the amount specified in section 1332(a).* . . .

28 U.S.C. § 1146(c)(2) (emphasis added).

The unambiguous language of this amendment should be most helpful in the future in resolving amount-in-controversy issues. However, U.S. Bank's Notice of Removal was filed on November 11, 2011, prior to the effective date of the Federal Courts Jurisdiction and Venue Clarification Act of 2011, January 6, 2012. See Sec. 105. Effective Date. ("(a) In General.-- Subject to subsection (b), the amendments made by this title shall take effect upon the expiration of the 30–day period beginning on the date of the enactment of this Act, and shall apply to any action or prosecution commenced on or after such effective date. . . .").

Even though this clarifying amendment is not applicable in this case, the task of choosing the appropriate allocation of burdens has been simplified by the parties, who agree that *if there is a genuine factual dispute* about the amount-in-controversy, then the burden of proof is on the removing defendant to prove by a preponderance of the evidence that the Plaintiff may recover in excess of the jurisdictional threshold. *See* Defendant U.S. Bank National Association's Supplemental Brief In Opposition To Motion To Remand Action To State Court, (ECF No. 29), at 3 ("Where there are genuine disputes as to jurisdictional facts, the removing defendant must

demonstrate that jurisdiction exists by a preponderance of the evidence, i.e., by proof to a reasonable probability that jurisdiction exists."); Plaintiff's Supplemental Reply Memorandum In Support Of Motion To Remand, (ECF No. 31), at 2 ("In a case in which there are disputes over factual matters related to jurisdiction, the party asserting jurisdiction has to show jurisdiction by a preponderance of the evidence.").

The bone of contention is that Defendant insists there is no factual dispute, while Plaintiff insists there is. Plaintiff is right.

On the record before this Court, Defendant's insistence that there is no factual dispute because the amount-in-controversy may be perceived from the complaint and maybe a few public documents is patently unreasonable. On the contrary, significant, dispositive factual disputes exist and require fact findings by the Court, especially the number of County of Washington mortgage loans channeled through MERS and held in trust by U.S. Bank, and the number of assignments ( two or three?) with each such mortgage loan. Accordingly, U.S. Bank must prove, by a preponderance of the evidence, that Plaintiff's claims may reasonably exceed $75,000.

In its original brief in opposition to remand, Defendant correctly pointed out that when a Complaint does not articulate a precise figure for damages, courts may consider "the type of evidence which could properly be considered in addressing a motion for summary judgment." Defendant's Opposition to Motion to Remand Action to State Court, (ECF No. 16), at 4 (citing *Lewis v. Ford Motor Co*., 610 F. Supp. 2d 476, 483 (W.D. Pa. 2009)). In the Third Circuit, the type of evidence properly considered for a motion for summary judgment is *admissible* evidence. See *C.N. v. Ridgewood Bd. of Educ*., 430 F.3d 159, 173 (3d Cir. 2005) ("We are required to

review the record and draw inferences in a light most favorable to the non-moving party, yet the non-moving party must provide admissible evidence containing specific facts showing that there is a genuine issue for trial.") (quoting *Pennsylvania Prot. and Advoc., Inc. v. Pennsylvania Dept. of Public Welfare,* 402 F.3d 374, 379 (3d Cir. 2005); *Williams v. West Chester*, 891 F.2d 458, 466 (3d Cir. 1989); *Lewis*, 610 F. Supp. 2d at 483 ("Court may take into account the type of evidence which could properly be considered in addressing a motion for summary judgment." (citing, *inter alia*, *Evans v. Yum Brands*, 326 F.Supp.2d 214, 220 (D.N.H. 2004)). In general, hearsay evidence is not admissible and may not be considered at summary judgment.

### C.  **Findings of Fact and Conclusions of Law**

1.  The parties and the Court agree that the amount-in-controversy is determined by three factors: (i) the number of mortgage loans naming MERS as nominee that are held in trust by U.S. Bank for properties located in the County of Washington; (ii) the number of assignments of beneficial interests that occur in the securitization process between the originating loan and acquisition of said mortgage loans in trust by U.S. Bank; and (iii) the County of Washington's fee for recording transfers of beneficial interests/ assignments in mortgage loans.

2.  The fee for recording transfers of beneficial interests/ assignments in mortgage loans in the County of Washington is $52.50.

3.  The number of assignments of beneficial interests in mortgage loans naming MERS as nominee that are held in trust by U.S. Bank for properties located in the County of Washington is three.

U.S. Bank relied on County of Washington's own averments and theory of its case, as does this Court in making this finding.   The article referenced by Plaintiff in its Complaint, the

PSA for the RAMP Series 2005-EFC3 attached to the Complaint, the exemplar mortgage loans chosen in the Complaint, and the Plaintiff's theory and explanation of the securitization process, all support Defendant's position that there are three assignments for each of the subject mortgage loans. U.S. Bank also introduced an exhibit of about 60 PSAs on a CD disc, Defendant's Exhibit D3, which further supports its assertion that there are three assignments involved with almost every MERS mortgage loan. Plaintiff's counsel all but conceded this point at the hearing on July 2, 2012.

4.      The Court finds, from the admissible, competent evidence that has been adduced, that the number of mortgage loans naming MERS as nominee that are held in trust by U.S. Bank for properties located in the County of Washington is 102.

As discussed below, there is no admissible evidence to support any of the mortgage loans identified by all sources proffered by U.S. Bank, with the exception of the approximately 100 mortgage loans that U.S. Bank's lawyers unearthed while digging into the Landex public database for the County of Washington. (There is a minor discrepancy on the record as to references to the Landex-sourced figure as, variously, 99, 100 or 101. For present purposes, however, the slight difference is insignificant and the Court will use the round number in the middle.) Plaintiff conceded the reliability of the attorneys for U.S. Bank and of the results of their research in arriving at the Landex-sourced number 100. To that number, the Court will add the two exemplars referenced in the Complaint, for a total of 102 mortgage loans naming MERS as nominee held in trust by U.S. Bank for mortgaged properties located in the County of Washington.

**Evidentiary Rulings**

After close scrutiny of the testimony and affidavits of Irina Palchuk and the spotty and unreliable information upon which she and U.S. Bank based the compilation spreadsheet, Defendant's Exhibit D2, the Court finds that the "summary of summaries" spreadsheet and its underlying documents (spreadsheets provided by the other sources) are unreliable and inadmissible hearsay, and not admissible pursuant to any of the rules of evidence Defendant argues support its admission.

**Fed.R.Evid. 1006**. U.S. Bank offered Exhibit D2 as a summary under Rule 1006 of the Federal Rules of Evidence. Plaintiff objected and this Court took the matter under advisement. The Court now holds that Exhibit D2 is inadmissible under Rule 1006, Summaries to Prove Content, which currently provides:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

In accordance with Rule 1006, U.S. Bank produced to Plaintiff the "data and documentation" purportedly underlying and substantiating the mortgage loan information shown on Defendant's Ex. 2 prior to the evidentiary hearing. However, it is uniformly held "that summary evidence is admissible under Rule 1006 only if the underlying materials upon which the summary is based are admissible." *United States v. Pelullo*, 964 F.2d 193, 204 (3d Cir. 1992) (numerous citations omitted). *See also United States v. Bray*, 139 F.3d 1104, (6th Cir. 1998) (numerous citations omitted) ("'[c]ommentators and other courts have agreed that Rule 1006 requires that the proponent of the summary establish that the underlying documents are

admissible in evidence.' . . . Thus, if the underlying documents are hearsay and not admissible under any exception, a chart or other summary based on those documents is likewise inadmissible"); *United States v. Johnson*, 594 F.2d 1253, 1255-56 (9th Cir. 1979) (numerous citations omitted) ("proponent of the summary must establish that the underlying materials upon which the summary is based are admissible in evidence. The purpose of Rule 1006 is to allow the use of summaries when the volume of documents being summarized is so large as to make their use impractical or impossible; summaries may also prove more meaningful to the judge and jury. . . . Such a rationale imports that instead of using a summary, the proponent of the summary could introduce the underlying documents upon which the summary is based. . . . Moreover, requiring the proponent to show the admissibility of the underlying materials is necessary to protect the integrity of the Federal Rules.").

As the Court of Appeals for the Third Circuit stated, "Rule 1006 is '*not a back-door vehicle for the introduction of evidence which is otherwise inadmissible*,' and . . . the voluminous evidence that is the subject of the summary must be *independently admissible*." *Eichorn v. AT&T Corp*., 484 F.3d 644, 650 (3d Cir. 2007) (emphasis added).

Defendant's Exhibit D2 consists of summaries of summaries, and is essentially a spreadsheet amalgamating information gathered from other spreadsheets. As such, it is not admissible unless the underlying summaries/ spreadsheets from the various sources are admissible. Clearly, they are not.

Ms. Palchuk's testimony as well as her affidavits unequivocally establish that the information compiled on Exhibit D2 was harvested from spreadsheets she received from the various sources, including U.S. Bank's servicers and master servicers, and that the gathering

employees of those sources did not glean them from normal business records made in the regular course of business. There is also no doubt that the underlying summaries were specifically prepared at Ms. Palchuk's request in preparation for this litigation and this hearing in particular. There is also no doubt that neither the attorneys for County of Washington or Ms. Palchuk ever saw any of the underlying documentation or records supporting the sources' summary spreadsheets.

With a foundation like that, Exhibit D2 is inadmissible hearsay, and it may not be admitted under the exceptions asserted by U.S. Bank in support of admissibility.

**Fed.R.Evid. 803(6) and 902(11).** U.S. Bank asserts that the spreadsheets from Wells Fargo and Aurora are self authenticating and admissible under the business records exception. Rule 803(6), Records of a Regularly Conducted Activity, provides for admission of a record of an act, event, condition, opinion, or diagnosis if:

> (A) the record was made at or near the time by -- or from information transmitted by -- someone with knowledge;

> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

> (C) making the record was a regular practice of that activity;

> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

> (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Fed.R.Evid. 803(6).

Rule 902(11), Evidence That Is Self-Authenticating, provides:

> (11) Certified Domestic Records of a Regularly Conducted Activity. The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record--and must make the record and certification available for inspection--so that the party has a fair opportunity to challenge them.

Fed.R.Evid. 902(11).

As previously recounted, U.S. Bank produced certifications of authenticity from employees at Wells Fargo and Aurora, whose positions and titles were not disclosed. Both of these employees certified that they "prepared a spreadsheet containing information about mortgage loans secured by property in Washington County, Pennsylvania, that are in trusts for which U.S. Bank National Association serves as trustee," and obtained the information on this spreadsheet from records kept . . . in the ordinary course of business," as a regular practice of a master servicer for U.S. Bank.

Without testimony from the other sources, we cannot know whether the records from which the spreadsheet information was obtained is accurate, was kept in the normal course of a regularly conducted activity of business, or if making the record was a regular practice of that activity. We do know that Ms. Palchuk knew nothing about the underlying records and never asked to see them. We also know that the underlying documents supporting Exhibit D2, i.e., the underlying spreadsheets of the various servicers, were not kept in the regular course of business but, rather, were specifically and hastily prepared at U.S. Bank's request in preparation for this litigation and the hearing of July 2, 2012.

Accordingly, the Court finds that the underlying spreadsheets of the various sources are not domestic business records meeting the requirements of Rule 803(6)(A)-(C) or, therefore, of

Rule 902(11). *See AAMCO Transmissions, Inc. v. Baker*, 591 F.Supp.2d 788 (E.D.Pa. 2008) (memorandum prepared by franchisor's director of consumer affairs was not a business record within meaning of business records exception to hearsay rule, where it was created in anticipation of litigation with franchisee rather than in the course of regularly conducted business activity).

**Fed.R.Evid. 807**. Finally, U.S. Bank argues that Exhibit D2 and all of the underlying source spreadsheets are admissible under the residual hearsay exception, which provides that a hearsay statement is not excluded by the rule against hearsay, even if not covered by an enumerated exception, if (1) it has "equivalent circumstantial guarantees of trustworthiness"; (2) is offered as evidence of a material fact; (3) is "more probative" than any other evidence the proponent could "obtain through reasonable efforts;" and (4) admission would "best serve the purposes of these rules and the interests of justice." Fed.R.Evid 807(a). The residual hearsay exception is rarely invoked, and is only applicable in exceptional circumstances. *Bohler–Uddeholm America, Inc. v. Ellwood Group, Inc.,* 247 F.3d 79, 112 (3d Cir. 2001); *United States v. Mitchell*, 145 F.3d 572, 578 (3d Cir. 1998).

Exhibit D2 has been offered as evidence of a material fact, but that is the only element of Rule 807 that its proponent satisfies. There is no guarantee of trustworthiness, to say the least. In fact, the wildly different numbers of County of Washington - U.S. Bank mortgage loans gathered from Wells Fargo and Aurora's own records conducted at two different times (Wells Fargo – 607 and 143; Aurora – 282 and 73) indicates *exactly* the opposite. Moreover, U.S. Bank could easily have produced the preparers of the underlying spreadsheets to attempt to lay a proper foundation for their admission, so the Court cannot conclude that the spreadsheets are

more probative than other evidence the proponent could have obtained through reasonable efforts.

5.        The amount-in-controversy, as proven by a preponderance of the admissible, competent evidence, is $16,065 ($157.50 in avoided recording fees in each of the 102 implicated mortgage loans in the County of Washington).

6.        Assuming attorneys' fees are available (and U.S. Bank offered no support for their availability in this Pennsylvania common law class action) and would be 30%, as U.S. Bank has suggested is typical in class actions, the amount-in-controversy would swell by roughly $5,000. The amount-in-controversy is, therefore, approximately $21,000.

7.        Defendant made no attempt to value a possible award of punitive damages, nor did it offer any authority or factual basis for the availability of exemplary damages. The Court finds no basis for considering the possibility of exemplary damages toward the amount-in-controversy.

8.        Defendant made no attempt to monetize the value of any declaratory or injunctive relief, nor did it offer any authority or factual basis for any monetary value. From the viewpoint of the Plaintiff, the value of the rights which County of Washington seeks to protect is not the value of the notes or the loss in value if they would be declared unsecured debt, as Defendant seems to claim, but the value of the fees for mortgage assignments Defendant has failed to record.  To place a value on the equitable relief requested based on 102 mortgage loans as secured debt versus their value as unsecured debt might well prove incapable of accurate guesstimation, but if it could be done, it would certainly require expert evaluation, analysis and opinion.

In the absence of any attempt to put forth some evidence, authority or expert opinion on valuation of equitable relief in this case, the Court finds no basis for considering the addition of some monetary value for potential equitable relief to the amount-in-controversy.

## III.    CONCLUSION

For the reasons stated above, U.S. Bank has not met its burden of proving by a preponderance of competent, admissible evidence that the amount in controversy meets or exceeds the jurisdictional threshold. Therefore, it is respectfully recommended that Plaintiff's Motion to Remand (ECF No. 9) be granted and this case be remanded to the Court of Common Pleas of Washington County, forthwith.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72(D)(2) of the Local Rules for Magistrates Judges, Plaintiff is allowed until August 31, 2012, to file objections to this report and recommendation. Failure to file objections will waive the right to appeal. *Brightwell v. Lehman*, 637 F.3d 187, 193 n.7 (3d Cir. 2011).

Dated: August 17, 2012

s/ Cynthia Reed Eddy
CYNTHIA REED EDDY
UNITED STATES MAGISTRATE JUDGE

cc: all counsel of record on ECF